

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00295-CR

_____

DAVID THAMES A/K/A DAVID THOMAS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. F15-1315-158

Before Sudderth, C.J.; Gabriel and Pittman, JJ.
Memorandum Opinion by Justice Gabriel

## MEMORANDUM OPINION

Appellant David Thames a/k/a David Thomas appeals his conviction for burglary of a habitation with intent to commit sexual assault and resulting sentence of sixty years' confinement. *See* Tex. Penal Code Ann. § 30.02(a)(1). In a single issue,[1] he argues that he was denied his Sixth Amendment right to a speedy trial. We affirm.

## I. BACKGROUND

On December 22, 2014, Jessica[2] was in the apartment she shared with her fiancé. At that time, Jessica was about twelve weeks pregnant, and she occupied the apartment by herself because her fiancé was out of town for work. Throughout the day, Jessica had not felt well—the effects of morning sickness had forced her in and out of the bathroom all day long. Around 9:00 p.m., Jessica felt ill and rushed to the bathroom, where she vomited for fifteen to twenty minutes. When she left the bathroom, she went to her bedroom, and that is when Thames grabbed her from

---

[1]Thames initially raised two issues. In his first issue, he argued that he was denied his Sixth Amendment right to counsel because he was not appointed counsel until over a year after he had initially requested appointed counsel and had been found indigent. In its response, after supplementing the clerk's record, the State challenged the factual basis of Thames's assertion, stating that he had been appointed counsel only a week after his initial request for counsel. Thames filed a reply brief in which he conceded the State was correct, noting that the record now reflects he was appointed counsel "within days of [his] original application." Thames then expressly abandoned his first issue and asked us to grant relief based upon his second issue.

[2]To protect the complainant's privacy, we refer to her by a pseudonym.

2

behind, covered her mouth, dragged her toward the light switch, and turned off the light.

Thames told Jessica that he had a gun and a knife and that if she did not remain quiet or if she tried to look at him, he would kill her. Against Jessica's consent, and despite her verbal protestations and attempts to resist, Thames proceeded to undress, and then sexually assault, Jessica. After the assault, Thames dressed and asked Jessica for money. When Jessica told him she did not have any money, Thames laid on Jessica's bed and played on her laptop computer. While he was doing that, Jessica was able to put on some clothes and run out of the apartment. Jessica underwent a sexual assault nurse examination, which included vaginal and anal swabs. Testing later revealed that those swabs contained Thames's semen. Thames's DNA was also found on Jessica's neck, fingernails, and right ear.

A grand jury indicted Thames for burglary of a habitation with intent to commit sexual assault. *See id.* A jury convicted him of that offense and assessed his punishment at sixty years' confinement. The trial court sentenced him accordingly. Thames appeals.

## II.  THAMES'S RIGHT TO A SPEEDY TRIAL WAS NOT VIOLATED

In his sole issue, Thames contends he was denied his Sixth Amendment right to a speedy trial.

## A. APPLICABLE LAW AND STANDARD OF REVIEW

The Sixth Amendment affords the accused in a criminal prosecution the right to a speedy trial. U.S. Const. amend. VI. To determine whether a criminal defendant has been denied a speedy trial, we apply the balancing test set forth in *Barker v. Wingo*, 407 U.S. 514, 529–533 (1972). *See Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014). That test requires us to weigh, and then balance, four factors: (1) the length of delay; (2) the State's justification for the delay; (3) the defendant's assertion of the right; and (4) the prejudice the defendant suffered because of the delay. *Barker*, 407 U.S. at 530–32; *Gonzales*, 435 S.W.3d at 808; *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003).

We review speedy trial claims under a bifurcated standard of review. *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008); *Murphy v. State*, 280 S.W.3d 445, 452 (Tex. App.—Fort Worth 2009, pet. ref'd). We review the trial court's factual determinations for an abuse of discretion. *See Cantu*, 253 S.W.3d at 282; *Murphy*, 280 S.W.3d at 452. We view all of the evidence in the light most favorable to the trial court's ultimate ruling. *Cantu*, 253 S.W.3d at 282. We defer not only to the trial court's resolution of disputed facts, but also to its right to draw reasonable inferences from those facts. *Id.* In assessing the evidence at a speedy-trial hearing, the trial court may completely disregard a witness's testimony, based on credibility and demeanor evaluations, even if that testimony is uncontroverted. *Id.* And the trial court may

4

disbelieve any evidence so long as there is a reasonable and articulable basis for doing so. *Id.*

In contrast to the trial court's factual determinations, we review its legal determinations de novo. *See id.*; *Murphy*, 280 S.W.3d at 452. The application of the *Barker* test to the facts is a purely legal question and is thus subject to de novo review. *See Cantu*, 253 S.W.3d at 282.

## B. RELEVANT FACTS

Around March 10, 2015—approximately two-and-a-half months after the offense in this case occurred—Thames was incarcerated in Collin County on a theft charge that was unrelated to this case.[3] The record shows that while he was incarcerated for that charge, an arrest warrant issued against him in Denton County on March 17, 2015, upon the complaint of Detective Todd Haecker of the Dallas police department charging him with the offense of aggravated sexual assault of Jessica. Two days later, while still incarcerated in Collin County, Thames requested appointed counsel for the Denton County charge, and the Denton County district court appointed counsel for him on March 26, 2015.

Thames remained in the Collin County jail until approximately April 1, 2015, when, after pleading guilty to the unrelated theft charge, he was transferred to the Dallas County jail for another, unrelated charge of burglary of a habitation with intent

---

[3]The record reflects that on March 26, 2015, Thames pleaded guilty to misdemeanor theft and was sentenced to ten days' confinement.

to commit sexual assault, an offense that had occurred in Dallas County on December 26, 2014, which was four days after Jessica had been sexually assaulted. On April 3, 2015, Detective Haecker interviewed Thames at the Dallas police department regarding the Denton County charge. Thames was arraigned on the Dallas County charge on May 19, 2015. He was then indicted in the Denton County case on June 26, 2015.[4]

On October 27, 2015, a Denton County prosecutor spoke with a Dallas County prosecutor regarding the cases pending against Thames in their respective jurisdictions. Believing that the Denton County case was stronger than the Dallas County case, the prosecutors decided that the Denton County case should be tried first. To that end, on October 28, 2015, the Dallas County prosecutor authorized Thames to be transferred to Denton County but maintained a hold on Thames for his return to Dallas County once his Denton County case was resolved.

Despite the fact that Dallas County authorized Thames's transfer to Denton County on October 28, 2015, Thames remained in the Dallas County jail until April 5, 2016—a little over five months—at which point he was transferred to the Denton County jail. The next day, the Denton County court scheduled his arraignment for

---

[4]In his complaint supporting his application for an arrest warrant, Detective Haecker charged Thames with aggravated sexual assault. A grand jury ultimately indicted Thames with burglary of a habitation with intent to commit sexual assault.

April 29, 2016. The record shows that from April 29, 2016, to November 4, 2016, Thames agreed to having his case reset on five separate occasions.

Though represented by appointed counsel, Thames filed several pro se motions in Denton County. On May 18, 2016, he filed a motion to dismiss, claiming that his incarceration in Dallas had caused him unreasonable anxiety and stress and had impaired his ability to adequately defend himself in the Denton County case because "recollection of vital information as to the facts of this case [were] now diminished" and because he was not able to "acquire investigative services in order to obtain facts or locate, interview, and call critical and potential alibi witnesses." Thames also alleged there was insufficient evidence to support the charge against him. But Thames did not allege his right to a speedy trial was being violated, nor did he ask the trial court for a speedy trial. Instead, Thames alleged his rights to due process and effective assistance of counsel were being violated, and he asked the trial court to dismiss the indictment.

In a pro se letter to the trial court filed on July 8, 2016, Thames asserted that he was incarcerated in Dallas County when he was indicted in the Denton County case and that "so much time [had] passed [that] it [had] caused a great impairment to" his defense. Thames enclosed a pro se motion to quash, which was also filed on July 8. In this motion, Thames requested the trial court to quash the indictment for the same reasons he had requested the trial court to dismiss the indictment in his May 18 motion to dismiss. Yet, as with his May 18 motion to dismiss, Thames did not assert

in the trial court that his right to a speedy trial was being violated, nor did he request a speedy trial. Rather, he asserted that his rights to due process and effective assistance of counsel were being violated.[5]

On July 12, 2016, Thames filed another pro se motion to dismiss the indictment, this time alleging that the State lacked standing because it had not alleged an injury-in-fact against him. Thames again did not allege a speedy-trial violation or request a speedy trial but simply requested the trial court to dismiss the charges against him. On July 22, 2016, Thames filed a pro se application for writ of habeas corpus under the federal habeas statute raising the same complaints he raised in his previous motions and asking the trial court to release him from "detainment" and give him "immediate relief" from his charges. On January 24, 2017, Thames filed another pro se letter in which he asked for a hearing on his previously filed pro se motions, and he further informed the trial court that he had filed a grievance against his appointed counsel. Thames requested the trial court to appoint him new counsel.

On January 31, 2017, the trial court held a pretrial hearing at which it granted Thames's appointed counsel's motion to withdraw based on the fact that Thames had filed a grievance against him; informed Thames that as a result, he was representing himself; and told Thames that his trial was set for February 13. The trial court then

---

[5]Thames filed a nearly identical motion to quash on July 12, 2016, the differences from his July 8 motion being that the July 12 motion (1) added a line stating he was filing the motion "under [his] [p]ro [s]e rights" and (2) added a notary's signature.

8

took up and denied Thames's pro se motions. Because the trial court declined to grant his motions to dismiss his case, Thames requested that another attorney be appointed for him. The trial court indicated on the record that although it preferred to go forward with Thames's trial on February 13 as scheduled, it would not be able to do so because Thames had requested new counsel. The trial court subsequently signed an order appointing new counsel for Thames.

Also on January 31, Thames filed another pro se motion to quash. In this motion, Thames alleged the police conducted a biased investigation against him by failing to follow up on information he provided to Detective Haecker during his interview. Specifically, he alleged that he told Detective Haecker that, contrary to Jessica's story that she did not know her attacker, he had actually met Jessica at a Wal-Mart before the assault occurred; Jessica had given him her phone number; and they had exchanged phone calls and text messages before the assault occurred. Thames alleged the police were biased because they did not obtain security video from the Wal-Mart or phone records to verify his account. In addition, Thames re-urged the same ground he had alleged in his motions to quash and to dismiss. He again asserted his rights to due process and to assistance of counsel were being violated and asked the trial court to quash the indictment. The trial court denied the motion.

On February 3, 2017, Thames's newly appointed counsel filed a motion asking the trial court to appoint an investigator, which the trial court granted.

On April 21, 2017, the trial court held a status hearing that primarily involved discovery issues. But in addition, Thames's appointed counsel indicated that he wanted a rehearing on Thames's motion to quash based on a speedy trial violation. The trial court stated that it would hold a rehearing but suggested that Thames's counsel consider filing an amended motion. The trial court stated, "I'm treating his request as a request for speedy trial, which starts the clock ticking. I don't believe I had a prior request [for speedy trial,] and so the clock wouldn't start ticking." Thames's counsel replied, "You did not."

The parties notified the court that the prosecutor had turned over an additional 250 pages of discovery to Thames a few days before the hearing. The prosecutor explained that he had met with investigators at the Dallas police department on two occasions and that after the first meeting, he obtained materials from them related to the case. The prosecutor further stated that he believed that was all the materials the Dallas police possessed and that after he obtained them, he turned them over to Thames. But when the prosecutor met with the Dallas police department the second time, he discovered there were additional materials, and he immediately provided those additional materials to Thames as soon as possible. In light of the newly provided discovery, the trial court agreed with Thames's counsel to postpone the May 1, 2017 trial setting to a future date that would not be determined until after the prosecutor had talked to all his witnesses.

Though he discussed his intention to do so at the April 21 status hearing, Thames's appointed counsel did not file an amended motion to dismiss on speedy-trial grounds until August 3, 2017. The motion asserted that the delay in the case had caused Thames to suffer oppressive pretrial incarceration, anxiety, and concern. In addition, the motion alleged that the delay had resulted in the loss of video evidence from the Wal-Mart, the inability to obtain pertinent text messages he exchanged with Jessica, and the inability to contact known, but unnamed witnesses who may have been able to contradict Jessica's assertions. And the motion further alleged that the delay had impaired Thames's right to present a defense due to his fading memory of the events leading to his arrest. The motion requested only that Thames's charges be dismissed with prejudice.

The trial court held a hearing on Thames's amended motion to dismiss on August 25, 2017. During the hearing, Thames testified regarding his incarceration dates and places beginning approximately March 10, 2015, in the Collin County jail through his present incarceration in Denton County.[6] Thames also testified that during his April 3, 2015 interview, he told Detective Haecker that he first met Jessica in a Wal-Mart, that he paid for her groceries, and that he later exchanged text messages with her. Thames further testified that based on this interaction with Jessica, he later met her and offered to pay her if she would perform oral sex on him,

---

[6]We have set forth the substance of Thames's testimony as it relates to his incarceration, and we need not do so again here.

but after she did so, he refused to pay her. Thames stated that he did not receive any assistance on his case until April 2016 despite requesting an attorney in March 2015.

Thames testified that in his Dallas County case, he had filed a motion for speedy trial. He also stated that he had discussed the issue of a speedy trial with his first attorney in the Denton County case and decided not to worry about a speedy trial because his attorney was trying to get him a plea deal. Thames further acknowledged that he had previously agreed to have his trial reset on five occasions.[7] Thames also agreed that he had filed a grievance against his first appointed counsel resulting in his lawyer's withdrawal and precipitating a further delay in his trial.

Thames stated that he never attempted to retrieve any surveillance video from the Wal-Mart where he allegedly met Jessica. With regard to the alleged text messages with Jessica, Thames said that he had used a friend's phone to exchange those messages. Thames provided the friend's first name but did not know his last name, and he further said that he believed the friend had moved to Milwaukee. According to Thames, the last time he ever spoke to his friend was a few days before his arrest in March 2015. Thames agreed that it is generally hard to track a person down if their last name is unknown, but he also said that he believed his friend could have been found through Facebook.

---

[7]The trial court admitted the documents reflecting those agreements, which showed those five agreed resettings occurred between April 29, 2016, and November 4, 2016.

12

A representative from the loss prevention department at the Wal-Mart where Thames alleged he had met Jessica also testified. The representative testified that he had been subpoenaed to bring security video from the Wal-Mart from December 2014, the time period during which Thames alleged he had met Jessica. The representative stated that it was not possible for him to bring such footage because the surveillance system's regular operations automatically deleted recorded footage after thirty days and there was no way to retrieve such video after the system deleted it. In order to retrieve footage from December 2014, the representative testified, it needed to be retrieved no later than the following month. And the representative further stated that nobody sought any video related to this case at any time in December 2014 or January 2015.

Thames's court-appointed investigator also testified at the hearing. He testified that Thames had requested him to locate and acquire text message records from MetroPCS but that he learned that the text messages Thames sought could not be retrieved due to the company's retention policy. According to the investigator, the retention schedule for text messages on MetroPCS's network was thirty days, meaning they did not keep any sent messages for more than thirty days after they were sent.

Finally, at the hearing, the prosecutor and Thames's counsel stipulated to the facts regarding the communications between the Denton County and Dallas County

prosecutors and Thames's transfer from the Dallas County jail to the Denton County jail.[8]

Thames then argued that his right to due process, to due course of law, to present a defense, and to a speedy trial were violated. And the remedy he asked for was dismissal of the charges pursuant to *State v. Terrazas*, 962 S.W.2d 38, 41–42 (Tex. Crim. App. 1998). In response, the prosecutor argued that the appropriate remedy for Thames was not dismissal but rather that a trial be held quickly.

The trial court noted that it found Thames's testimony not to be credible. The trial court then denied Thames's amended motion to dismiss. Thames's trial began on September 11, 2017, less than five months after he filed his amended motion to dismiss based on speedy-trial grounds.

## C. APPLYING THE *BARKER* TEST

### 1. Length of Delay

The length-of-delay factor operates as a triggering mechanism for the *Barker* analysis in that if the length of delay is not presumptively prejudicial, courts need not consider the other factors. *Barker*, 407 U.S. at 530; *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002). The boundary of time from which the length of delay is measured starts at the time the defendant is arrested or formally accused and ends at the time of trial or when the defendant demands a speedy trial. *See Zamorano*,

---

[8]As we have already detailed those facts above, we need not repeat them here.

14

84 S.W.3d at 648; *Dragoo*, 96 S.W.3d at 313. Because of the imprecision of the right to speedy trial, the length of delay that will trigger further inquiry is necessarily dependent upon the peculiar circumstances of the case. *Barker*, 407 U.S. at 530–31; *Zamorano*, 84 S.W.3d at 648–49. Nevertheless, in general, courts deem a delay approaching one year to be unreasonable enough to trigger the *Barker* inquiry. *Balderas v. State*, 517 S.W.3d 756, 768 (Tex. Crim. App. 2016).

Moreover, the extent to which the delay exceeded the minimum needed to trigger the *Barker* inquiry factors into our weighing of the length-of-delay factor. *See id.* That is, the longer the delay extended beyond the minimum triggering threshold, the more heavily the length-of-delay factor weighs in favor of the defendant. *Compare id.* (stating that because delay of more than eight years was "far beyond" the minimum threshold to trigger *Barker* inquiry, the length-of-delay factor weighed "heavily" in defendant's favor), *and Orand v. State*, 254 S.W.3d 560, 566 (Tex. App.—Fort Worth 2008, pet. ref'd) (stating that because delay of nearly twelve years was "far, far beyond" the minimum threshold to trigger *Barker* inquiry, the length-of-delay factor weighed "extremely heavily" in defendant's favor), *with State v. Fisher*, 198 S.W.3d 332, 338 (Tex. App.—Texarkana 2006, pet. ref'd) (stating that presumptively prejudicial delay of ten months was insufficiently long to weigh length-of-delay factor more than "slight[ly]" in defendant's favor).

Thames was arrested on March 17, 2015, and his trial did not commence until September 11, 2017, a delay of nearly thirty months. But Thames requested a speedy

15

trial on April 21, 2017—twenty-five months after his arrest. The State concedes the delay in this case is sufficient to trigger the *Barker* inquiry, and we agree, as it exceeds the one year delay courts have generally deemed sufficient to trigger *Barker*. *See Balderas*, 517 S.W.3d at 768. Furthermore, we would characterize the delay in this case as extending "well beyond" that minimum threshold and, thus, we conclude the length-of-delay factor weighs heavily against the State. *See Mendez v. State*, 212 S.W.3d 382, 385 (Tex. App.—Austin 2006, pet. ref'd) (concluding delay of twenty-three months went "well beyond" minimum to trigger *Barker* and, consequently, holding the length-of-delay factor "weigh[ed] heavily against the State"); *see also Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003) (concluding delay of thirty-eight months stretched "far beyond" minimum to trigger *Barker* and, consequently, holding the length-of-delay factor "weigh[ed] heavily in favor" of the defendant).

## 2. The State's Justification For The Delay

Under the second factor, the State bears the burden of showing the delay was justified. *Shaw*, 117 S.W.3d at 889 n.3. Our evaluation of this factor involves a sort of sliding scale whereby we assign different weights to different reasons for the delay. *See Barker*, 407 U.S. at 531; *Balderas*, 517 S.W.3d at 768. Thus, for example, if the delay resulted from the State's deliberate attempt to hamper the defense, then this factor will be weighed heavily against the State. *Barker*, 407 U.S. at 531; *Balderas*, 517 S.W.3d at 768. If the delay resulted for more neutral reasons, such as the State's negligence or overcrowded courts, then this factor will still weigh against the State, though less

16

heavily so. *Barker*, 407 U.S. at 531; *Balderas*, 517 S.W.3d at 768. If the delay resulted from a valid reason, such as a missing witness, then this factor will not weigh against the State at all. *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999). We also consider whether the State or the defendant was more to blame for the delay. *Balderas*, 517 S.W.3d at 768. Delay caused by either the defendant or his counsel weighs against the defendant. *Balderas*, 517 S.W.3d at 768 (citing *Vermont v. Brillon*, 556 U.S. 81, 90–91 (2009)). But in the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay. *Id.*

For purposes of our analysis, the nearly twenty-five month delay in Thames's case breaks down into two segments: first, the period from his arrest on March 17, 2015, to his arrival in the Denton County jail on April 5, 2016; and second, the period from his arrival at the Denton County jail to his demand for a speedy trial on April 21, 2017.

With regard to the reasons-for-delay factor, neither party focuses much attention on the period of time from Thames's arrest on March 17, 2015, through October 27, 2015, the date on which the Denton County prosecutor and Dallas County prosecutor mutually determined that Thames's case in Denton County should proceed first. We note, however, that the record does not establish that portion of the delay resulted from any attempt on the part of the State to prejudice Thames.

17

Both parties primarily focus on the delay that occurred after Dallas County consented to release Thames to Denton County on October 28, 2015, while maintaining its hold on Thames for return to Dallas County when his Denton case was disposed of. As of that time, Thames had been incarcerated in Dallas County for almost seven months. Yet even though Dallas County consented to transfer Thames to Denton County on October 28, 2015, Thames was not transported to Denton County until a little more than five months later on April 5, 2016. Thames argues that this delay was willful or callous on the State's part and that the State did not offer any valid reason for the delay. Based on this, Thames concludes the reasons-for-delay factor should weigh heavily in favor of dismissal.

Thames is incorrect for two reasons. First, while the record does not reflect that the State offered a valid reason for this five-month delay, it also does not reflect that it resulted from the State's deliberate attempt to prejudice Thames. The record is simply silent as to the reasons for this particular delay.

Second, Thames's argument neglects entirely the portion of the delay from April 5, 2016, through April 21, 2017. As outlined above, after his arrival in the Denton County jail on April 5, 2016, the trial court scheduled Thames's arraignment for April 26, 2016. From April 29, 2016, through November 4, 2016, Thames agreed to five resettings, the last of which set his trial for February 13, 2017. During that period of time, Thames filed several pro se motions and letters to the trial court asking it to dismiss the charges against him.

As his February 13, 2017 trial date neared, Thames filed a grievance against his appointed counsel, necessitating his counsel's withdrawal, and when the trial court thereafter declined to grant his pro se motions to dismiss the charges against him at the January 31, 2017 hearing, Thames requested the trial court to appoint new counsel for him. Because of this request, the trial court reluctantly reset his trial again. Then, upon Thames's request, the trial court appointed an investigator for him on February 3, 2017. And the record reflects that at some point, the trial court reset Thames's trial for May 1, 2017.

That leads to the April 21, 2017 status hearing, where the record reflects the trial court removed Thames's May 1, 2017 trial setting, at his counsel's request, because the State had recently furnished him with additional discovery.[9] Thames's appointed counsel indicated at the April 21, 2017 hearing that he intended to file an amended motion to dismiss based in part on a speedy trial claim, but he did not ultimately file that motion until August 3, 2017, and the trial court promptly heard that motion on August 25, 2017.

Thus, the record is a mixed bag with regard to the reasons for the delay in this case. On the one hand, the approximately twelve-and-a-half month delay from the time Thames was arrested to the time he was transferred to the Denton County jail—

---

[9]The record does not reflect that the timing of the State's disclosure of the additional discovery was a deliberate attempt to prejudice Thames. In fact, Thames's counsel acknowledged he had no issue with the prosecutor's office over this issue.

including the approximately five-month period that elapsed between the time the State decided to try Thames's Denton County case first and the time he was actually transferred to Denton County for that purpose—is largely unexplained, and the record does not reflect that delay was a deliberate attempt to prejudice Thames. On the other hand, the record shows that except for the delay that stemmed from the State's late disclosure of discovery, most of the approximately twelve months of delay between the time Thames arrived in Denton County and his eventual demand for a speedy trial elapsed either with his approval through agreed resettings or else resulted from his own conduct through his filing of pro se motions; his filing of a grievance against his appointed counsel that resulted in his counsel's withdrawal; his request for new counsel; and his delay in filing, and obtaining a hearing on, his amended motion to dismiss. We conclude that the State and Thames were equally to blame for the delay in this case, and thus we do not weigh this factor against either of them. *See Hopper v. State*, 520 S.W.3d 915, 928 (Tex. Crim. App. 2017) (analyzing the reasons-for-delay factor and concluding that "[b]ecause the parties are equally blameworthy for that period of delay, the reasons-for-delay factor is essentially neutral").

### 3. Thames's Assertion of The Right

Although a defendant's failure to assert his speedy trial right does not amount to a waiver of that right, failure to assert the right makes it difficult for him to prove that he was denied a speedy trial because his lack of a timely demand indicates strongly that he did not really want a speedy trial and was accordingly not prejudiced

by the lack of one. *Dragoo*, 96 S.W.3d at 314. And the longer the delay, the more a defendant's inaction weighs against him. *Id.* Likewise, filing for a dismissal instead of a speedy trial generally weakens a speedy trial claim because it shows a desire to have no trial rather than a speedy one. *See Murphy*, 280 S.W.3d at 454. Thus, if a defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure. *See id.*

According to his own testimony, Thames filed for a speedy trial in his Dallas County case, and he discussed with his lawyer the issue of a speedy trial in his Denton County case. He thus was cognizant of his right to a speedy trial and knew how to assert it. Yet he did not assert that right in his Denton County case for quite some time. Instead, after he arrived in Denton County, he filed numerous pro se motions and letters requesting the trial court to dismiss the charges against him but never made reference to his right to a speedy trial. Additionally, Thames agreed to have his case reset on five occasions, and then just a few weeks before his February 13, 2017 trial setting, he informed the trial court that he had filed a grievance against his first appointed counsel, which ultimately resulted in his withdrawal. And after the trial court granted Thames's first appointed counsel's motion to withdraw, Thames told the trial court that he did not want to represent himself at trial and requested the trial court to appoint him another attorney. Thames did not advance a speedy trial claim until his second appointed counsel filed the amended motion to dismiss on August 3, 2017, nearly twenty-eight months after his arrest and sixteen months after he was

transferred to Denton County. And even in this motion, Thames did not request a speedy trial; rather, he requested a dismissal.

We conclude that Thames's lengthy delay in asserting his right to a speedy trial, as well as his many requests for a dismissal of his charges, strongly indicates that he did not really want a speedy trial. *See Murphy*, 280 S.W.3d at 454 (weighing assertion-of-the-right factor against appellant because she "did not assert her right to a speedy trial for a lengthy period of time, and then once she did assert the right it was in the form of a motion to dismiss the charges against her"). We therefore weigh the assertion-of-the-right factor against Thames.

## 4. Prejudice

When a court analyzes *Barker*'s prejudice factor, it must do so in light of the defendant's interests that the speedy trial right was designed to protect: (1) to prevent oppressive pretrial incarceration, (2) to minimize the accused's anxiety and concern, and (3) to limit the possibility that the accused's defense will be impaired. *See Dragoo*, 96 S.W.3d at 315 (citing *Barker*, 407 U.S. at 532). Of these forms of prejudice, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* (quoting *Barker*, 407 U.S. at 532).

The defendant has the burden to make some showing of prejudice, although a showing of actual prejudice is not required. *Munoz*, 991 S.W.2d at 826. When the defendant makes a prima facie showing of prejudice, the burden shifts to the State to show that the defendant suffered "no serious prejudice beyond that which ensued

from the ordinary and inevitable delay." *Id.* (quoting *Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973)).

As to the first interest of preventing oppressive pretrial incarceration, the "dispositive consideration" is the impairment of a defendant's liberty with its effects upon the defendant. *Id.* at 828. Thames has not met his burden to show that the delay in this case caused him to suffer oppressive pretrial incarceration. That is so because although the record shows Thames was incarcerated for the entire twenty-five month period that elapsed between his arrest and his demand for a speedy trial in this case, it also shows that he had a pending, unrelated charge in Dallas County during that same period of time and likely would have been incarcerated on that charge independent of his Denton County charge. Thames was initially incarcerated in Collin County and then in Dallas County, and Dallas County consented to a transfer of Thames to Denton County to be tried on the charge in this case. The jail record introduced by Thames's counsel showed that the Dallas County district attorney's office approved the release of Thames to Denton County while instructing that "our hold remains on him so he will be sent back to Dallas [County] when Denton County is done with him." Since the record supports a finding that Thames would have been incarcerated for another charge during the twenty-five month period that is relevant here, we cannot say that Thames met his burden to show the delay in this case caused him oppressive pretrial incarceration. Thus, consideration of this first interest weighs against finding a prima facie showing of prejudice. *See Webb v. State*,

36 S.W.3d 164, 174 (Tex. App.—Houston [14th Dist.] 2000 pet. ref'd) (declining to find oppressive pretrial incarceration where appellant was incarcerated for twenty months before trial but had been sentenced to confinement on another charge and would have been confined on that charge during the same twenty-month period); *McDonald v. State*, No. 05-97-00588-CR, 1999 WL 796948, at *3 (Tex. App.—Dallas Oct. 7, 1999, no pet.) (mem. op., not designated for publication) ("When the defendant is legally confined for other crimes, there is no oppressive pretrial incarceration.").

Turning to the second interest, Thames contends he suffered great anxiety as a result of the delay. The only evidence that Thames suffered anxiety as a result of the delay in his trial came from Thames's own testimony, which the trial court was free to disbelieve given its finding that Thames was not credible.[10] *See Cantu*, 253 S.W.3d at 282. But that aside, Thames's testimony conveyed nothing more than generalized anxiety, and he did not establish it was any greater than the level of anxiety that would normally be associated with a criminal charge or investigation. And further, Thames was incarcerated in Dallas County on an unrelated charge during part of the twenty-five month period that is relevant here and subject to a hold for the Dallas charge for the entirety of the period. There is no evidence that the anxiety he allegedly suffered resulted in any way from the delay in this case as opposed to the charges pending

---

[10]The trial court stated that Thames was "hardly believable," had "zero credibility," and had "horrifically bad" credibility.

24

against him in Dallas County. Thus, even if the trial court had found Thames credible, his testimony would have been insufficient to prove prejudice. *See id.* at 286 ("[E]vidence of generalized anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation."). Accordingly, consideration of this second interest weighs against finding a prima facie showing of prejudice.

Finally, the third interest. Thames asserts that the delay impaired his defense in that it caused him to lose exculpatory evidence. At the hearing, Thames suggested that video surveillance footage from Wal-Mart would have showed that he had met Jessica there a few days before the sexual assault occurred, thereby supporting his claim that his interactions with Jessica were consensual. And he asserted that his lengthy incarceration had resulted in his inability to obtain that surveillance video. We note again, however, that the trial court found Thames not to be credible and thus could have disbelieved his story. *See id.* at 282.

But that notwithstanding, the representative from the Wal-Mart's loss prevention department testified that the company's video surveillance system automatically deleted footage that was more than thirty days old, that any deleted footage could not be recovered, and that nobody had requested footage related to this case in either December 2014 or January 2015. And Thames testified that the first time he ever told investigators about his encounter with Jessica at the Wal-Mart was

during his April 3, 2015 interview with Detective Haecker, well after any surveillance video from the Wal-Mart in December 2014 would have been permanently deleted. Accordingly, even assuming the Wal-Mart surveillance video would have helped Thames's defense, the loss of that evidence is not attributable to any delay in Thames's trial.

Thames also contends that the delay of his trial resulted in the loss of the MetroPCS records showing that he exchanged text messages and phone calls with Jessica after he obtained her phone number at the Wal-Mart. However, the court-appointed investigator testified that because of the phone company's records retention policy, he could not obtain records of text messages or phone calls more than thirty days after they were sent over the network. And again, according to Thames's own testimony, he first provided his story about meeting Jessica at Wal-Mart to investigators at his April 3, 2015 interview with Detective Haecker, more than thirty days after those communications were allegedly exchanged. Thus, as with the loss of the surveillance video, the loss of any phone records showing communications with Jessica before she was sexually assaulted did not stem from any delay in Thames's trial.

Finally, Thames asserts that the delay in his trial caused him to lose a witness who was favorable to his defense, namely, the friend whose phone he used to communicate with Jessica. Thames testified that he used his friend's phone to communicate with Jessica so that his girlfriend would not find out that he was

26

communicating with Jessica. However, he stated that he only knew this friend's first name and that he believed the friend had moved to Milwaukee. The trial court found that Thames was not credible, and thus it was entitled to disbelieve his testimony concerning his friend. *See id.* at 282. Moreover, to claim prejudice because of a missing witness, a defendant must show that (1) the witness was unavailable at the time of trial, (2) the witness's testimony would have been relevant and material, and (3) the defendant exercised due diligence in attempting to locate the witness. *Clarke v. State*, 928 S.W.2d 709, 716 (Tex. App.——Fort Worth 1996, pet. ref'd). Thames did not meet this burden to show due diligence, as the record here is silent with respect to what measures he took to locate his friend.

Having considered the three interests the speedy trial right was designed to protect, we conclude that Thames made no prima facie showing that he suffered oppressive pretrial incarceration, that the delay in his trial caused him to suffer anxiety or concern, or that it impaired his defense. Accordingly, we conclude that Thames failed to show he was prejudiced by the delay of his trial. We therefore weigh the prejudice factor against Thames.

### 5. Balancing the *Barker* Factors

Having addressed the four *Barker* factors, we must now balance them. Weighing heavily in favor of finding a violation of Thames's speedy trial right is the excessive delay. The reason for the delay is neutral, given our conclusion that the State and Thames were equally at fault for it. Weighing against finding a violation of

the right is Thames's lengthy delay in asserting it and his numerous requests for a dismissal rather than a speedy trial, as well as his failure to demonstrate prejudice. Accordingly, we hold that the weight of the four *Barker* factors, balanced together, is against finding a violation of Thames's right to a speedy trial.

We overrule Thames's sole issue.

## III. CONCLUSION

Having overruled Thames's sole issue, we affirm the trial court's judgment. Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 17, 2019